923 F.2d 839
 Unpublished Disposition
NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Lucila NAZARIO ECHEVARRIA, Plaintiff Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee.
 No. 90-1346.
 United States Court of Appeals, First Circuit.
 Oct. 19, 1990.
 
 Appeal from the United States District Court for the District of Puerto Rico; Jaime Pieras, Jr., District Judge.
 Raymond Rivera Esteves and Juan A. Hernandez Rivera on brief, for appellant.
 Daniel F. Lopez Romo, United States Attorney, Jose Vazquez Garcia, Assistant United States Attorney, and John F. Aronson, Assistant Regional Counsel, Department of Health and Human Services, on brief, for appellee.
 D.P.R.
 AFFIRMEDED.
 Before TORRUELLA, SELYA and CYR, Circuit Judges.
 PER CURIAM.
 
 
 1
 Claimant, Lucila Nazario Echevarria, at age 46, filed an application for Social Security disability benefits on August 8, 1986. She alleged that she had been unable to work since May 1, 1986, due to problems associated with her back, right arm, and nerves. She was insured through December 31, 1986. Her application was denied initially and on reconsideration. On December 11, 1987, after a hearing, the Administrative Law Judge (ALJ) found that claimant could perform her past work and thus was not under a disability. Claimant requested a review by the Appeals Council. On review, the Council remanded the case for further proceedings. It found that a Psychiatric Review Technique form had not been completed and that the standard for evaluating subjective complaints of pain set forth in Avery v. Secretary of Health and Human Services, 797 F.2d 19 (1st Cir.1986), had not been followed.
 
 
 2
 A second hearing was conducted at which a Vocational Expert (VE) appeared. Claimant testified that she suffers constant pain in her fingers, back, waist, joints, knees, hips, hands, upper neck and right arm. The medication she takes alleviates the pain, but the pain always returns. She stated that she can not sit or stand for more than one-half hour. She cannot bend, lift, nor straighten her right arm due to a childhood accident. She experiences headaches and muscle spasms in her left arm and shoulders; this results in numbness. The pain in her back also radiates down her left side. She stays inside the house as she can only walk for a little distance. She has no energy for such housecleaning chores as sweeping, ironing, washing or cooking. However, in a Disability Report, dated August 8, 1986, claimant stated that she sometimes did household chores. Her husband helps her with her personal hygiene. Again, in the Disability Report, claimant said that she took care of her own personal needs.
 
 
 3
 As for her mental impairment, claimant testified that she experiences nightmares from which she awakens screaming. She could not remember when she had been in mental health treatment or why she had once stopped going. She stated that she is easily excitable, breaks things and cries. She testified to trying to commit suicide and still feels like dying. She forgets everything, hears voices and sees shadows. On the day of the hearing, she stated that she had taken her medications and felt somewhat calm and sleepy. On January 19, 1989, the ALJ again found that claimant was not under a disability. The Appeals Council approved the ALJ's decision on June 19, 1989, rendering it the final decision of the Secretary of Health and Human Services. Claimant appealed to the United States District Court for the District of Puerto Rico. It affirmed the Secretary's decision. This appeal ensued.
 
 I.
 
 4
 The ALJ found that claimant could not perform her past relevant work as a sewing machine operator. This work involved making leather purses. It entailed a light work level and was semi-skilled in nature. The ALJ stated that such skills were not transferable to other semi-skilled or skilled work. He also found that in performing her prior work, claimant was required to sit for eight hours, with constant reaching, bending, pushing and pulling.
 
 
 5
 In reviewing the medical evidence, the ALJ concluded that, as for claimant's physical complaints involving neck, shoulder, arm and low back pain, the objective medical evidence supported a diagnosis of mild degenerative joint disease. There was muscle spasm along the paravertebral spine, with cervical and lumbosacral sprain. Claimant experienced a mild limitation of motion in the cervical and lumbar region. There were no limitations on movements of her neck. Due to an old injury to her right elbow, claimant could only flex her arm 90 degrees. The ALJ determined that claimant could not stand for more than six hours, could not lift or carry items weighing over ten pounds and could not push or pull. She could perform repetitive, routine jobs.
 
 
 6
 In relation to claimant's mental impairment, the ALJ determined that she had a severe affective disorder. He found that the record revealed a diagnosis of dysthymic disorder with sleep loss, depression, anxiety and somatic complaints. Under the "B" criteria of the Psychiatric Review Technique form, the ALJ concluded that claimant had moderate limitations in activities of daily living and social functioning and that she never experienced deficiencies of concentration or suffered episodes of deterioration at work. This emotional condition, the ALJ found, resulted in claimant's being unable to understand, remember and carry out detailed and complex instructions and being unable to deal with the public.
 
 
 7
 The ALJ concluded that claimant did not have an impairment or combination of impairments listed in, or medically equal to, one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. He still found that claimant's complaints of pain were not credible to the degree alleged. For this conclusion, he relied upon the X-ray generated diagnosis and the nonexistence of pain producing impairments in the musculoskeletal area. He also placed emphasis on claimant's statements in the Disability Report and on his observation of her at the hearing. While claimant's impairments would prevent her from returning to her past work as a sewing machine operator, the ALJ determined that she nevertheless had the residual functional capacity to perform the exertional demands of sedentary work. Although she could not perform the full range of sedentary work due to her nonexertional impairment, the testimony offered by the VE concerning the presence of jobs which claimant could perform and Rule 201.19 of Medical-Vocational Guidelines (the "grid"), used as a framework, 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 1, persuaded the ALJ that claimant was not disabled.
 
 II.
 
 8
 On appeal, claimant makes three primary arguments. She claims that the ALJ misapplied the grid. Next, she argues that the ALJ ignored the VE's response to one of the hypotheticals posed by the ALJ. This hypothetical included all of claimant's subjective complaints of non-exertional impairments and under it the VE decided that claimant was disabled. Finally, she generally maintains that the ALJ cited only evidence favorable to a finding of not disabled, thereby not considering the record as a whole.
 
 III.
 
 9
 Normally, we would not rely on the ALJ's use of the grid in circumstances such as these. Where there are non-exertional limitations, such as a mental impairment, the grid does not accurately reflect what jobs might be available. Gagnon v. Secretary of Health and Human Services, 666 F.2d 662, 665 n. 6 (1st Cir.1981). In such a circumstance, the ALJ must first determine that the non-exertional restrictions do not significantly affect claimant's ability to perform the "full range of jobs" requiring sedentary work. See Rodriguez Pagan v. Secretary of Health and Human Services, 819 F.2d 1, 3 (1st Cir.1987), cert. denied, 484 U.S. 1012 (1988); Lugo v. Secretary of Health and Human Services, 794 F.2d 14, 17 (1st Cir.1986). Where non-exertional limits do have a significant effect on the claimant's ability to perform the full range of jobs in a certain category, the grid cannot be applied. Lugo, 794 F.2d at 17. Often, the assistance of a vocational expert will be required. Id.
 
 
 10
 Here, the ALJ found that claimant's non-exertional impairment--her emotional problems--was severe and, in fact, did limit her residual functional capacity for the full range of sedentary work. Clearly, then, the mere use of the grid alone would have been inappropriate. However, because the ALJ utilized the services of a VE and because there was substantial evidence in the record as a whole to support the ALJ's conclusion, his use of the grid is not fatal to his decision.
 
 
 11
 At the hearing, the ALJ presented several hypotheticals to the VE. Responding to the ALJ's first and second hypotheticals, the VE stated that the movement limitation of claimant's right elbow would not prevent her from performing her past work or similar jobs. If any significant pain were present, however, her capacity to function would be diminished. If the pain responded to medication, she still could perform her past work. In his next hypothetical, the ALJ hypothesized the same right elbow condition and added to it a mental condition that featured depression, anxiety, somatic complaints, sleeping problems, limitations in dealing with the public and problems in performing complex instructions. In response, the VE expressed concern that her sleep disturbances could interfere with the ability to perform her work adequately. However, in regard to the other symptoms, he stated that such an individual would be able to perform claimant's past work and other related occupations. He noted that claimant's past work as a sewing machine operator was, ultimately, routine work.
 
 
 12
 The ALJ then added, to the above hypothetical, claimant's mental condition as it was presented in a psychiatric evaluation performed by Dr. Cintron Oliver. He described moderate limitations in claimant's capacity for contact with other people, moderate retardation in thought production and limitations in carrying out complex instructions, but no limitations in performing simple instructions. He also described claimant as relevant, logical, coherent and oriented in place and person, but mildly disoriented in time. She appeared depressed, with memory problems but with fair judgment. The VE stated that these moderate limitations would not exclude claimant from performing her past work.
 
 
 13
 The ALJ then described claimant's subjective complaints of irritability, difficult interpersonal relations, headaches, body and chest pains, suicidal ideas with one suicide attempt, sleepiness from medications, difficulty standing and sitting for long periods of time, hearing voices, constant fright, long periods of crying and seeing shadows. The VE responded that, with these limits, adequate performance of any job was not possible.
 
 
 14
 Claimant's attorney then suggested that, in addition to the limitations posed in the hypothetical which incorporated the report of Dr. Oliver (leaving out claimant's subjective complaints), the VE add the limitations identified in the examination and physical capacities evaluation of Dr. Grovas, which included restrictions on continuous pushing, pulling, lifting, carrying, operating foot controls, stooping, bending or holding the neck in a flexed position for long periods of time. In response, the VE stated that the limitations identified by Dr. Grovas in his RFC assessment would prevent claimant from performing her past work but they would not exclude her from other jobs such as garment tender, garment folder, bagger, and spot cleaner. He stated that these jobs, in his experience, existed in significant numbers in the national economy.
 
 
 15
 We believe that there is substantial evidence in the record as a whole to support the ALJ's decision finding claimant not disabled despite the VE's opinion that claimant would be disabled if her subjective complaints were credited.
 
 
 16
 As for claimant's physical impairments, an X-ray of the lumbosacral spine, taken on February 25, 1987, was essentially negative. Trans. at 149. Another X-ray, dated June 3, 1986, revealed a normal left shoulder and cervical spine, with some muscle spasm. The dorsal spine was normal, except for the presence of mild spurring. The diagnostic impression was mild degenerative joint disease. Trans. at 127.
 
 
 17
 A physical examination conducted by Dr. Carlos Grovas Badrena on June 17, 1986, and submitted by claimant's attorney, Trans. at 132, revealed a full range of motion of the neck, with normal gait and posture. There was evidence of muscle spasm in the thorax region and evidence of paravertebral muscle spasm. Claimant had a full range of motion of her hips, knees, ankles and feet. There were no abnormal reflexes. The diagnosis was cervico-lumbar myositis. A physical capacities evaluation also was completed. In it, claimant was found to be able to sit, stand and work for three hours each in an eight-hour work day. She could occasionally lift and carry up to ten pounds. She could not use her hands for pushing or pulling and could not crawl or squat. She could occasionally bend, climb and reach. Despite these findings, he concluded that claimant could perform no gainful employment.
 
 
 18
 A neurologist, Dr. Hector R. Stella Arrillaga, examined claimant on February 2, 1987. Trans. at 147. He found some limitation of movement, although her gait was normal and she had adequate muscle tone and strength. He diagnosed cervical and lumbo-sacral sprains. He noted that she should refrain from bending, lifting, climbing stairs, driving a car and being around moving machinery. Another physician, Dr. Pagan, on August 17, 1988, found marked spasticity of the neck musculature and lumbar paravertebral musculature. He diagnosed severe neck and low back pain and ankylosis of the right elbow. He stated that claimant had a poor prognosis.
 
 
 19
 The ALJ accepted the X-ray based diagnosis of mild degenerative joint disease and the VE's advice that claimant could perform sedentary work in spite of the limits described above. He found that the evidence did not establish a medically determinable basis for the severity of claimant's complaints of pain as alleged. Although one physician corroborated severe pain, other physicians found claimant with adequate muscle tone and strength and only evidence of mild spasm. This conflicting evidence concerning claimant's pain is for the ALJ to resolve. See Rodriguez v. Secretary of Health and Human Services, 647 F.2d 218, 222 (1st Cir.1981).
 
 
 20
 Given this, we find that the ALJ followed the guidelines set down in Avery, 797 F.2d at 21-24. He did, in fact, take into account claimant's complaints of limitations of movements, as well as the physicians' reports. He also carefully questioned claimant about her prior work, the duration and frequency of her pain, and her daily activities. In addition, a VE testified about these factors. As a result, there existed a sufficient breadth of information upon which the ALJ could rely in making a determination as to the credibility of claimant's pain. His conclusion that she could perform sedentary work, then, was supported by substantial evidence.
 
 
 21
 Regarding claimant's alleged nervous condition, a psychiatric evaluation was performed on August 11, 1986, at the Manati Mental Health Center. Trans. at 323. Claimant's behavior was described as cooperative and accessible. She was logical, coherent, and alert. She was mildly disoriented in time, but oriented in person and place. Her affect was mildly depressed and she was described as having poor insight and judgment. The diagnosis was depression and anxiety. Psychotherapy and medications were recommended.
 
 
 22
 On August 23, 1986, claimant was treated at a hospital emergency room for drug intoxication as a result of taking about 17 Elavil pills and an unknown quantity of another drug because of problems with her husband. Trans. at 140. After treatment and a few hours observation, she was discharged.
 
 
 23
 A psychiatric evaluation was performed on February 23, 1987, by Dr. Leopoldo R. Cintron Oliver. Trans. at 144-146. Claimant related that she had poor interpersonal relations with her husband, desired to be alone and, when angry, felt like taking her life. However, she stated that she had good relations with her neighbors and enjoyed receiving visits from her fellow church members and in-laws.
 
 
 24
 Dr. Cintron described claimant as not spontaneous, rather uncooperative, sad and tearful. Her thought production was mildly retarded but without blocking. She was relevant, logical, and coherent. She denied suicidal or homicidal ideas at that time and showed appropriate and adequate affect. She was found to be very depressed. She was mildly disoriented in time, but Dr. Cintron stated that her memory deficits were due to slow recall rather than true memory loss. Her judgment was described as fair and her insight poor. Dr. Cintron concluded that she was able to take care of her personal needs, manage her own funds, and did not need close supervision of her daily activities. She was diagnosed as having a moderate dysthymic disorder and a histrionic personality disorder. Her prognosis was guarded.
 
 
 25
 A psychiatric evaluation was done by the SIF on March 26, 1987. Trans. at 231-236. In this report, Dr. Juan A. Guillen, a psychiatrist, described claimant as alert and cooperative. Her association of ideas was adequate, with no hallucinations. He stated that she had an adequate attention span, but was anxious, tense, and tearful. She was logical, coherent, and relevant. She was oriented to person and place, but only partially oriented as to time. She had no homicidal or suicidal ideas and her memory, judgment and insight were adequate. A severe anxiety disorder was diagnosed.
 
 
 26
 In addition to the Psychiatric Review Technique form completed by the ALJ, another such form was completed, on March 18, 1987, by Dr. Jose Diaz Quinones. Trans. at 95. He found that claimant suffered from a non-severe affective disorder, accompanied by depression, somatic complaints and histrionic features. Under the "B" criteria, claimant was found to have slight limits in activities of daily living and social functioning. She seldom experienced deficiencies in concentration. There was insufficient evidence to establish whether she had ever had episodes of decompensation at work.
 
 
 27
 Given the above findings, we find that there was substantial evidence in the record as a whole to support the ALJ's conclusion that claimant's mental impairment did not render her disabled. The evidence relied upon by claimant, and allegedly ignored by the ALJ, formed only part of the record. All the psychiatric reports indicated that claimant was logical, coherent and relevant, despite her depression and anxiety. The VE's testimony supports the ALJ's conclusion. When asked whether claimant could work with depression, anxiety, somatic complaints, limitations in dealing with the public and problems with complex instructions, the VE stated that not only could claimant work, but that she could perform her past work. That the ALJ only gave credence to some of claimant's subjective complaints, given the other evidence in the record, was not error. He took all of the evidence into account, and although there were conflicts, he agreed with the VE that claimant's symptoms, as presented to the VE by the ALJ, did not prevent her from working. Such testimony, given the record as a whole, adequately supports the ALJ's conclusion that claimant's mental impairment did not render her disabled. See Rodriguez, 647 F.2d at 222.
 
 
 28
 Affirmed.